IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAVID YINGER,

          Plaintiff,

          vs.                      Case No. 15-1106-JTM

POSTAL PRESORT, INC.,

          Defendant.


MEMORANDUM AND ORDER


Plaintiff David Yinger brings this action against his former employer, Postal Presort, Inc., alleging disability discrimination and illegal retaliation for reporting workplace safety issues. Postal Presort has moved for summary judgment. For the reasons stated herein, the court finds that the defendant's motion should be granted.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### *Findings of Fact*

*Yinger's Employment at Postal Presort*

Yinger has a heart condition and had a pacemaker implanted in 2005. The same year, he began providing handyman services to Postal Presort on a contract basis. In September, 2006, he continued to provide those services but was compensated through Postal Presort's payroll system on a part-time basis.

Bryan Pulliam is the sole shareholder and is the President of Postal Presort, serving as its CEO. He has the exclusive right to hire and fire at Postal Presort. Yinger knew that Pulliam held this exclusive authority.

Beginning in approximately March, 2008, Postal Presort began to transition Yinger into a full-time position with more duties including "first shift machine operator, back up driver and facility handyman."

2

Yinger performed all physical duties associated with his work zealously and with no apparent restrictions. Yinger also described his work performance as being done with "over abundance."

On or about December 17, 2012, Yinger had the battery replaced in his pacemaker, and developed an infection. He asked for and received a leave of absence pursuant to the Family Medical Leave Act (FMLA). Based upon information provided by his doctor's office, Postal Presort approved a twelve week leave of absence. This leave began January 23 and ended April 17, 2013. Yinger knew he would be required to have a release to return to work.

On March 11, 2013, while still on leave, Yinger met with Evelin Nicholes, the Human Resources manager at Postal Presort. Yinger told Nicholes his doctor did not think he could return to work by the end of his approved leave on April 17, but that he could return to work by April 23.

Nicholes emailed this information to Pulliam, who responded, "Thank You."

The defendant stresses that, as of this March 11, 2013 meeting, Yinger did not know for certain whether he would be released for a return to work as of April 23, 2013. Yinger also agreed in his deposition that he did not tell Postal Presort he was disabled, and did not request an extra week off as an accommodation.

Yinger did not specifically ask for an extension, and testified in his deposition that his doctor had not approved his return for work as of April 17, the end of his approved leave.

Nicholes did not interpret the meeting as a request for an extension. However, Pulliam interpreted it that way, and granted the extension.

About April 6, 2013, Yinger went to Postal Presort and asked to speak to Pulliam, but left before Pulliam got to the reception area.

3

On April 18, 2013, Nicholes asked Pulliam what she should do, now that April 17 had passed and Mr. Yinger had not returned to work. Pulliam responded:

> Silence until the end of the month, then just send him the obligatory COBRA information. That should be the end of it.
>
> If he shows up or asks any questions, refer him directly to me, and I will handle it kindly and diplomatically with him. But in light of shifting work load, there is not a current position open for him. He would be welcome to reapply and would be considered when we need to once again beef up our inserting operations.

Between April 17 and 23, 2013, Yinger knew from a text message from his supervisor Doug Wenzel, that Yinger would have to talk to Pulliam before he clocked in.

On April 23, Pulliam emailed Nicholes that he did not have any personal need to meet with Yinger on that day. He questioned having time in his schedule, and also that Yinger should submit an application, but Postal Presort was, on that date, overstaffed.

Nicholes telephoned Yinger , and told him that Postal Presort was not bringing him back to his job.

Later the same morning, Yinger met with his doctor and obtained a release to return to work without restrictions.

He then went to Postal Presort to turn in his uniforms and give Nicholes the physician release. Yinger asked for a letter indicating he had been terminated, but Nicholes refused. She also told Yinger that Pulliam did not have time to talk with him that day.

Yinger was in the reception area when Pulliam greeted another individual who had an appointment with Pulliam. Although Yinger encountered Pulliam in the reception area when Pulliam greeted his other guests, Yinger did not stay to talk to Pulliam, and instead left.  When Pulliam returned shortly thereafter to the reception area to greet Yinger, Yinger had already left.

Yinger submitted an application for unemployment on the same day, April 23, 2013. The defendant stresses that this occurred without any further discussion with the company, without any direct termination of employment, and without any negotiation toward any

reasonable accommodations. According to the defendant, Postal Presort's receipt of notice of Yinger's unemployment filing was its first knowledge that Yinger was not going to meet with Pulliam and that Yinger considered his employment ended.

This contention, that Yinger unilaterally abandoned his employment, is generally consistent with the position that Postal Presort took at the time. In response to Yinger's unemployment form, which asked for the "Name and the title of who discharged claimant," Postal Presort wrote, "employee himself." Similarly, Pulliam testified in his deposition that

> [b]efore I could greet him and bring him into my office, he wheeled and turned and left on his own making no contact with me. And to my utter shock and dismay, the very next day I received in the mail an unemployment form. So, I made my conclusion based on what he had said, that he was going to leave the company.

But perhaps the shock is overstated. Pulliam had already emailed Nicholes that there was no position open for Yinger. In the same email, he wrote that Nicholes should refer Yinger to him so that he could handle it "diplomatically." Later, however, Pulliam apparently changed his mind, and emailed Nicholes that he would have no time to meet with Yinger, and that he should submit an application for employment. Consistent with these instructions, Nicholes told Yinger that Postal Presort was not taking him back. Under these circumstances, a reasonable jury could conclude that Yinger was terminated rather than quit his employment.

*Knowledge of disability*

On April 23, 2013, Yinger did not explicitly tell anyone in management at Postal Presort that he had a disability. He is unable to identify any actual limitations of function he was experiencing as of April 17, 2013. In fact, he testified:

> Q:   What serious health condition did you believe that you had on April 17, 2013?
>
> A:   What serious health?

Q:   Yes.

A:   I'm not a doctor. I have no clue.

Q:   Okay. Has anyone told you that as of April 17, 2013 you had a serious health condition?

A:   It was an ongoing health condition.

Q:   That's because you're recovering from the surgery and maintenance following the pacemaker replacement?

A:   Yes.

When asked what his disability was, Yinger testified:

Q:   On April 17, 2013 what was your disability?

A:   I was still under doctor's care.

Q:   On what basis do you claim that that constitutes a disability under the Americans With Disabilities Act?

A:   Because I am not a doctor. I cannot determine when I am able to go back to work.

Yinger testified that no one at Postal Presort ever told him that they felt he had a disability due to his pacemaker. The only discrimination he claims is his belief he wasn't given an extra week of unpaid leave. He testified he cannot describe any action on the part of Postal Presort that suggests that as of April 17, 2013, it believed he had any restrictions.

Pulliam has stated that he did not regard Yinger as having any disability. He was aware Yinger needed some time away from work for medical treatment concerning his infection, but at no time did he believe that Yinger's infection was anything more than a temporary condition.

The requirement of a release to return to work was consistent with Postal Presort's published employee manual.

According to one of his co-workers, before Yinger went on FMLA leave, Yinger indicated that he would only be around long enough to get his next heart surgery. The plaintiff's response denies this contention, but the cited testimony from Yinger's deposition

6

is equivocal. He testified, "I don't know if it was put that way. 'I don't plan on working here the rest of my life' is probably what I said."

At no time was any action or inaction of Postal Presort related to any alleged disability of Yinger, nor to any outcome of his employment status.

Pulliam testified that, if Yinger actually discussed his employment with him, he would have learned of the catastrophic loss of business, and could have been placed on layoff status.

*Financial Condition of Postal Presort*

On or about February 5, 2013, Ray Stasieczko, a significant Postal Presort employee who was working with Pulliam on the development of a new program for the electronic receipt and distribution of documents suddenly left the company.

Postal Presort lost its two largest customers in early 2013 — Emprise Bank on March 18, and Speedy Cash on April 4. The loss of these customers resulted in a dramatic reduction in actual pieces processed by the production department. In 2012, the "click count," or measure of actual pieces handled, was a fairly static number just in excess of 1.4 million pieces per month in January, February, and March. In April of 2012, the click count exceeded 2.5 million. In 2013, it began to decline from a range of 1.6 million in January and 1.75 million in February to 1.5 million in March, and by April, the click count was reduced to 1.1 million.  In April of the previous year, the click count had exceeded 2.5 million. As a result of this reduction in volume, while the 2012 total was nearly 17.5 million, in 2013 the total was 15.7 million, and 15.1 million in 2014.

The loss of these two customers resulted in a loss of over $500,000 in gross income, some $350,000.00 annual net profit. Postal Presort commingles mail to maximize postage discounts and enhance profits, and the loss of these two largest customers further compounded losses on all remaining work, through lost zip code densities, resulting in

overall losses larger than indicated solely by the direct loss.

Financial records from Postal Presort indicated that the company earned between $2.0 and $2.2 million in total income in each quarter from January-March of 2012 to January-March of 2013. However, in the second quarter of 2013 total income dropped precipitously to $1.5 million. During the next five quarters, total income varied between $1.3 and 1.8 million. Through the end of 2015, total income never exceeded $2 million in any quarter.

As of April, 2013, following the loss of these two customers, Pulliam was assessing which employees needed to be laid off to reduce payroll. Various employees left the corporation and were not replaced, and management was looking at every possible means of cutting expenses to meet the drastic reduction in revenues.

Immediately following the loss of the Speedy Cash and Emprise accounts, Postal Presort had to look at layoffs to reduce employee overhead. A number of people left on their own, allowing Postal Presort to reduce employee costs through attrition. As a result of the loss of these customers, management had to assess how to deal with the loss of revenue, and in particular, what employees might have to go as a result of the loss.

In addition, in an attempt to ensure survival of the company, Pulliam sought outside emergency backing from two immediate sources. On April 5, 2013, Pulliam contacted Ron Robbins about obtaining backing to ensure company survival. Robbins subsequently declined on April 11, 2013; and on April 11, 2013, Pulliam contacted Bart Brown, but did not obtain his response prior to April 23, 2013. Ultimately, Brown also declined. Additional and ongoing efforts towards outside working capital financing continued with other sources.

The testimony from Yinger's supervisor Wenszel is uncontroverted — if Yinger had returned after his FMLA leave, Postal Presort would have been overstaffed.

The plaintiff attempts to controvert this fact by citing the testimony of Nicholes, defendant's HR manager, that on April 17, 2013 "there was a current position open for him [Yinger]," and that it would have been easy for the defendant to grant him one more week of leave. (Nicholes dep., at 87, 99). But this ability to grant more *unpaid* leave does not controvert the existence of overstaffing, or the serious economic condition of the defendant.

In fact, Nicholes' testimony generally indicated that the position was not permanent or immune from layoffs:

> the fact that he did not return just made the decision for us which person in that area if there needed to be a layoff, he basically stood up and by attrition, by giving up, by three days of no call/no show, by lack of communication, he presented himself as the answer to *a question that may have been inevitable within a couple of months.*

Similarly, the plaintiff cites Pulliam's deposition in an attempt to deny the overstaffing by asserting that the defendant "financially could have returned [him] to work." (Dkt. 68, at 12). In particular, Yinger relies on the following answer from Pulliam's deposition as evidence:

> It was down to at that particular moment the inserting department and for weeks we discussed in-house when David comes back, everybody expecting him to come back. Yes, he would have had a job. He could have asked — oh, let me say this: After the financial calamity, he could have asked for 12 more weeks or 18 or 20 or a year, and I would have granted it because it would have been to the benefit of the company. If he had permitted it, we would have negotiated something to the betterment of both of us. I could not handle it any other way. So, would he have had a job in light of the financial calamity? It's problematic. But if he expressed he wanted it, I guarantee you it would have been worked out in some form or another to our benefits. Even if it meant hanging on with him on staff, coming in over-staffed for a few more months because by July — April, May, June, July — that close, we launched our first version of Postalocity and anticipated rapid growth. Could I have hung on and kept him for three months when I didn't need him? You bet. That's how I handle every summer without layoffs is I keep people employed without sending them home. I could have done it and would have done it, but he made the choice to send me unemployment separation papers.

(Pulliam dep. at 84-85).

Read in context, the court finds no basis for concluding, on the basis the cited testimony, that the defendant was not substantially overstaffed. While Pulliam does testify

that he hoped for "rapid growth" with a new program in the summer of 2013, and agreed that he might have "hung on and kept [Yinger] for three months," his testimony was clear that the company was experiencing a "financial calamity."

Pulliam directed indicated that Yinger's position was nonessential ("I didn't need him") and the company was overstaffed. That testimony is consistent with Pulliam's general desire to keep people on staff. "That's how I handle every summer without layoffs is I keep people employed without sending them home. I could have done it and would have done it, but he made the choice to send me unemployment separation papers." But kept him on how? While Pulliam indicated a willingness to try and "negotiate[] something [with Yinger] in some form or another," he also testified that permanent employment status was "problematic."

More importantly, in this passage of the deposition, Pulliam merely indicated that Yinger "would have had a job" *while remaining on unpaid leave*. Yinger had been on 12 weeks leave, and Pulliam's testimony that Yinger "could have asked for 12 *more* weeks or 18 or 20 or a year, and I would have granted it" clearly references an agreement for Yinger to remain on unpaid FMLA leave.

The court finds no substantial inconsistency in Pulliam's testimony or affidavit. The defendant was experiencing a financial calamity and was substantially overstaffed. The plaintiff's position was not essential. Had Yinger asked for an extension of his unpaid leave, this would have been granted, but long term paid employment was "problematic." However, the problem was resolved when, as is uncontroverted, Yinger presented the defendant with unemployment papers rather than a physician's release.

The defendant has also supplied evidence from witnesses other than Pulliam that Postal Presort was indeed overstaffed at this time, and the plaintiff fails to controvert this

evidence.[1] Although Postal Presort has hired some employees since April 23, 2013, it has not added any employees to the production department, and it is uncontroverted that the overall size of Postal Presort's workforce has been declining since 2013.

Pulliam states in his affidavit that, if Yinger had been put back on the payroll at Postal Presort, it would have been an undue hardship, and an unreasonable accommodation, because it would have worsened the extent to which Postal Presort was overstaffed.

Pulliam sought input from the production supervisor, Doug Wenzel, regarding which employees were most and least important to production. Wenzel felt other employees were more valuable to the company than Yinger.

*OSHA Investigation*

On July 20, 2012, OSHA investigated a complaint received three days earlier concerning asbestos at Postal Presort. Pulliam suspected Yinger had made the complaint, which he considered unfounded and malicious, and suspected in fact that Yinger had created the hazard in collaboration with another employee.

The same day, the entire staff was called into action on a critical project, which was the main focus for all employees that day.

On the day of, or immediately after, Pulliam posted an email and a memo reflecting the events of July 20, 2012. The memo included the observation that "[a]s for the OSHA thing, I feel very comfortable that most of the issues covered were trumped up by someone intending to do us harm."

---

[1] The plaintiff's only response to defendant's evidence is to complain that overstaffing "is a relative term which is vague and undefined." (Dkt. 68, at 19). The plaintiff offers no evidence or authority for interpreting the term to be somehow devoid of its natural meaning.

A day or so after the OSHA investigation, Yinger confronted Pulliam about his concern that the memoranda seemed to single him out. Pulliam wrote a memo apologizing for what he realized was an inartfully worded memo.

There were no other incidents between July 20, 2012, and January 22, 2013, indicating that Postal Presort was unhappy with Yinger for any reason.

In the time between July 20, 2012, and January 22, 2013, Yinger requested, and received, leave including medical leave. Between the date of the OSHA inspection and the commencement of Yinger's FMLA, there were no other confrontations between Pulliam and Yinger.

*Conclusions of Law*

In the Pretrial Order, plaintiff alleges as part of his factual contentions that his "heart condition in 2013 was a disability within the meaning of the ADA." (Pretrial Order, at 4). He further alleges that the surgery in 2013, and the resulting infection, precluded him from an immediate return to work. He alleges that Postal Presort "regarded [him] as disabled because of his heart condition and his pacemaker." (Id. at 5). His specific legal claim for relief under the ADA is limited. He contends that Postal Presort "failed to provide the reasonable accommodation of allowing plaintiff to have one more week of approved leave from work before returning from his approved leave." (*Id*. at 9).

The parties do not dispute the essential elements of a prima facie claim under the ADA. The plaintiff must demonstrate that "(1) he has a disability within the meaning of the ADA; (2) the employer had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4) the employer refused to provide such accommodation." *Bones v. Honeywell Int'l.*, 223 F.Supp.2d 1203, 1218 (D.Kan. 2002).

The defendant argues that Yinger's claim fails because (a) he has not shown that it regarded him as disabled, (b) he failed to seek a reasonable accommodation, and (c) extra leave would have imposed an undue hardship on the company. In addition, the defendant argues that a failure to accommodate claim should be dismissed, since the relevant regulations establish that a "failure to accommodate" claim cannot be advanced where the employee alleges only that he was regarded as disabled.

> A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the "actual disability" prong (paragraph (g)(1)(I) of this section), or "record of" prong (paragraph (g)(1)(ii) of this section), *but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong* (paragraph (g)(1)(iii) of this section).

See 29 C.F.R. §1630.2(o)(4) (emphasis added).

The defendant stresses that Yinger's heart condition has existed since 2005, and he worked successfully for the company with the heart condition and with a pacemaker. The only reasonable accommodation cited by Yinger in the Pretrial Order is the failure to grant an additional week of FMLA leave, based upon the idea that it regarded him as disabled at that time.

The plaintiff responds to this argument by stressing the existence of the heart condition itself as a disability, and notes Congress's actions in altering the ADA in the wake of *Sutton v. United Air Lines*, 527 U.S. 471 (1999), so that the existence of a disability is determined "without regard to the ameliorative effects of mitigating measures." As a result, under the applicable regulations, "the non-ameliorative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(4)(ii).

Even so, the evidence before the court only demonstrates at most the existence of a "regarded as" claim. Yinger's heart condition existed since 2005, and he performed his

work without any restriction or accommodation. This changed temporarily with an infection in 2013. At the time of his termination, his doctor had certified that he was able to return to work without restriction. Asked in his deposition as to the nature of his health condition, Yinger indicated this was the fact that he was in "recovery from the surgery and maintenance following the pacemaker replacement." There is no evidence before the court that Yinger was actually disabled within the meaning of 42 U.S.C. § 121012(1)(A) at the time of the termination. Rather, at most, plaintiff has advanced evidence showing that the defendant might have regarded him as disabled at this time.[2] Accordingly, a failure to accommodate claim is not actionable under the facts of the case under 29 C.F.R. § 1630.2(o)(4).

Even assuming that a failure to accommodate claim was actionable, there is a further problem. Under 42 U.S.C. § 12102(3)(B), the "regarded as" prong of the ADA statute "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of six months or less." 42 U.S.C. §12102(3)(B). Plaintiff's health condition, he testified in his deposition, was the recovery from the surgery, including the time required to deal with the resulting infection. That infection extended the required leave from twelve to thirteen weeks. The impairment as a result of the surgery and infection was transitory within the meaning of § 12102(3)(B).

Even if Yinger did have a disability or was regarded as disabled, the facts also fail to demonstrate that he gave the defendant notice of a need for additional accommodation. See E.E.O.C. v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) ("before an employer's duty to provide reasonable accommodations—or even to participate in the "interactive process"—is triggered under the ADA, the employee must make an adequate request,

---

[2] The defendant of course disputes regarding the plaintiff disabled. While plaintiff argues that Postal Presort regarded him as disabled because he was required "to get a release to return to work before he could return to work of any kind," (Pretrial Order, p.5, Exhibit B), defendant cites evidence indicating that such a policy of obtaining a release to return is hardly uncommon.

thereby putting the employer on notice").

The court finds that Yinger's meeting with Nicholes on March 11 reflected a request to extend the FMLA leave for a further week. Although the defendant notes Yinger admitted in his deposition that he did not explicitly and formally ask for his leave to be extended until April 23, it is a natural interpretation of his statement to Nicholes that he could not obtain his release until that date. And, indeed, Pulliam viewed it this way, approving the extension for the additional week.

The defendant stresses that on April 23, Yinger did not ask "for even more time, or that he asked to come back to work," but instead " failed entirely to follow through with the required discussion with Mr. Pulliam, and then on his own volition, turned heel and filed for unemployment."  (Dkt. 58, at 21).  However, as noted earlier, there is evidence from which a reasonable trier of fact could conclude that such a request was moot. Pulliam had notified Nicholes that there was no longer a position for Yinger, and that he would have to reapply for employment. And although he originally told Nicholes to send Yinger to him personally so that he could handle the termination diplomatically, he later informed her that he would not have time to meet with him. That is, the defendant effectively terminated Yinger on April 23.

Nevertheless, the uncontroverted evidence indicates that, to the extent Yinger sought a reasonable accommodation, it was not denied. Yinger did obtain a de facto extension of the leave. At the time of the termination, Yinger had been released for a full return to his work. Yinger sought no accommodation for additional leave after April 23.

Finally, with respect to the ADA claim, the court finds that reinstatement would have been an undue hardship for the defendant. The defendant has supplied substantial evidence that the company faced a financial crisis in 2013, and that the only thing which prevented immediate layoffs was the voluntary departure of some employees. The plaintiff

has supplied no evidence which would controvert this factual picture.[3]

For purposes of accommodation under the ADA, factors relevant to the existence of undue hardship include:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;
>
> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;
>
> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;
>
> (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and
>
> (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2).

The plaintiff has supplied no reason for concluding that the stated rationale for the failure to return him to active status is a pretext for illegal discrimination.

In addition to the ADA claim, the plaintiff also alleges that Postal Presort violated Kansas law by terminating him in retaliation for submitting a report to OSHA. The parties do not dispute the essential elements of a claim for retaliatory discharge under Kansas law. The prima facie elements of the claim are that the plaintiff asserted a particular right provided by law, such as a workers' compensation claim; the employer had knowledge of

---

[3] As discussed earlier, the plaintiff's response argues that Pulliam's affidavit should be rejected *in toto* because of the factual dispute as to whether he was terminated or voluntarily left his employment. The court finds no basis for completely rejecting all evidence supplied by Pulliam, including the otherwise uncontroverted evidence as to the financial condition of the company and the resulting overstaffing. The financial condition of the company is supported by documentary exhibits and other witnesses, as is the fact that other employees were more essential to the company than Yinger.

that claim; the employer terminated the plaintiff's employment; and there is a causal connection between the protected activity and the termination. *See Rebarchek v. Farmers Co-Op. Elevator*, 272 Kan. 546, 553-554, 35 P.3d 892 (2001).

The defendant argues that Yinger's retaliatory discharge claim fails as to the last two elements, because he voluntarily left his employment when he failed to speak to Pulliam on August 23, and because there is no proof of a causal connection between the 2012 OSHA investigation and the end of the plaintiff's employment in 2013. In addition, defendant argues that even if Yinger presented a prima facie case of retaliation, he has failed to rebut the evidence showing that the termination was due to the economic condition facing the company at the time. (Dkt. 58, 27-28).

The plaintiff argues that a factual question exists as to "many important issues like why, when, how, and how Plaintiff's employment ended," including the "incorrect assumption that Plaintiff never requested a reasonable accommodation." (Dkt. 68, at 37). Interestingly, plaintiff makes no direct argument that he was the person who contacted OSHA, and simply stresses evidence indicating that Pulliam believed he was the person who did so.

As noted above, and construing all of the evidence in the light most favorable to the plaintiff, the uncontroverted facts show that Yinger was effectively terminated because of the need for downsizing at the company. Further, Yinger's meeting with Nicholes on March 11, 2013 effectively reflected a request for a one week extension of the unpaid FMLA leave.

More importantly, there is simply no evidence of causation, other than Yinger's own suspicion the OSHA investigation may have played a role in his termination.[4] The OSHA

---

[4] Yinger himself offers contradictory evidence on the issue. While he testified at the end of his deposition that he thinks the OSHA investigation may have played a role in the termination (dep. at 201-02), he had earlier testified that he had no direct knowledge of any link. Asked "What do you understand the interaction is, if any, between the OSHA claim and your eventually not returning to work at Postal Presort in April, 2013?," Yinger responded, "As far as

investigation occurred in July 2012, and Yinger was terminated in April 2013. This nine month period is far outside the time that may give rise to an inference of causation. *See White v. Tomasic*, 31 Kan. App. 2d 597, 602-03, 69 P.3d 208, 212 (2003) (indicating five months was the likely maximum period giving rise to such an inference) (citing *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 28 Kan.App.2d 104, 110–11, 13 P.3d 17 (2000), *aff'd in part, rev'd in part*, 272 Kan. 546, 35 P.3d 892 (2001).

The plaintiff has supplied no evidence that the OSHA investigation remained a subject of concern at Postal Presort at the time of Yinger's termination, that the issue played any actual role in his termination, or that the company did anything other than treat him favorably during the intervening nine months. To the contrary, the company approved Yinger's FMLA leave, and effectively granted a requested one week extension. It terminated his employment only after the onset of an economic crisis threatening the company itself, and the plaintiff has provided no evidence whatsoever that the company was not overstaffed given its financial condition. The court concludes that the plaintiff has failed to present any evidence that the alleged protected conduct caused an adverse employment action, and grants summary judgment on the retaliation claim.

IT IS ACCORDINGLY ORDERED this 29th day of June, 2016, that the defendant's Motion for Summary Judgment (Dkt. 55) is hereby granted.

            <u>s/ J. Thomas Marten</u>
            J. THOMAS MARTEN, JUDGE

---

I know there was nothing to do with OSHA. It was something — disability." (*Id*. at 18).